**LENARD E. SCHWARTZER**
2850 SO. JONES BLVD., STE. 1
Las Vegas, NV 89146
(702) 307-2022

TRUSTEE

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.    BK-S-15-16493-ABL |
| MICHAEL F. EGAN, III, | Chapter 7 |
| | **TRUSTEE'S MOTION FOR ORDER APPROVING A COMPROMISE OF CLAIMS BETWEEN THE BANKRUPTCY ESTATE AND DAVID ALEXANDER NEUMAN** |
| Debtor. | |
| | Date:  May 9, 2016<br>Time: 11:00 a.m.<br>Place: Foley Building, 3rd Flr. |

LENARD E. SCHWARTZER, Chapter 7 Trustee (the "Trustee) moves this Court approve the proposed Settlement Agreement between the Bankruptcy Estate and David Alexander Neuman ("DAN") which is attached to the Motion and the Trustee Decl. as <u>Exhibit 1</u>.    Subject to Bankruptcy Court approval, the Trustee has entered into the Settlement Agreement in the exercise of his reasonable business judgment, after evaluating the claims which belong to the Bankruptcy Estate and the claims asserted by DAN against the Bankruptcy Estate.    Pursuant to the Settlement Agreement, if approved by the Bankruptcy Court, DAN will pay the Bankruptcy Estate the net amount of $5,000.00,[1] plus he will release claims against the estate in the asserted amount of

---

[1]    That amount may increase to $21,150.00 if an exemption is claimed by Egan and ultimately allowed.

approximately $10,700,000.00 million (plus potential punitive damages) arising out of a pending malicious prosecution action wherein DAN is the plaintiff and Michael F. Egan, III, Debtor ("Egan") is the sole remaining defendant.  In exchange for this consideration, the Trustee will cause the Bankruptcy Estate to release and compromise any claims held by Egan or the Bankruptcy Estate against DAN as of the petition date of the pending chapter 7 case.  The Settlement Agreement is a full compromise of claims between the Bankruptcy Estate and DAN, and no party concedes liability or fault concerning any of the alleged claims.

## STATEMENT OF FACTS IN SUPPORT OF MOTION

1.    A summary of the facts, assertions and procedural status which gives rise to the claims between Egan (claims now owned by the Bankruptcy Estate and controlled by the Trustee)[2] and DAN is as follows:

a.    Egan filed an action in the United States District Court for the District of Hawaii entitled *Michael F. Egan, III v. David Alexander Neuman,* U.S.D.C., District of Hawaii, Case No. 14-cv-00190 SOM BMK (the "Action"), based on what DAN asserts to be scurrilous and false allegations of sexual assault purportedly committed by DAN against Egan in Hawaii in 1999, when in fact, DAN established that he was never in Hawaii at the time the alleged assaults took place. Faced with a Rule 11 motion, and having tacitly acknowledged that his claims in the Action were without merit, Egan's counsel dismissed the complaint in the Action on June 4, 2014, without prejudice. DAN asserts that the Action was brought to smear, harass and severely injure DAN as part of an avowed and very public campaign by Egan and Egan's counsel to troll for new clients who would enable them to shake down entertainment industry executives with threats of sexual assault charges and thereby continue Egan's scheme of making money through fraudulent means.[3]

_____

[2]    Pursuant to 11 U.S.C. § 541, all of Debtor's Claims (defined below) against GA, including but not limited to the claims set forth in the Action or Schedule B, are property of the Estate and may be sold, settled and/or compromised by the Trustee, subject to Bankruptcy Court approval.

[3]    On December 8, 2015 Egan was sentenced to 24 months in federal prison based on his felony conviction in connection with a Ponzi scheme.  Egan is currently serving his sentence at the Federal Penitentiary in Duluth Minnesota.

PRINTED ON
RECYCLED PAPER

1    DAN asserts that such an improper ulterior motive and the obvious lack of evidence supporting his

2    claims renders Egan liable for malicious prosecution and abuse of process.

3          b.     To obtain redress against Egan's malicious prosecution and abuse of process

4    against DAN, on March 30, 2014, DAN filed an action against Egan in the United States District

5    Court for the District of Hawaii entitled *David Alexander Neuman v. Jeffrey M. Herman; Herman*

6    *Law Firm, P.A.; Mark F. Gallagher; and Michael Egan, III,* U.S.D.C., District of Hawaii, Case No.

7    1:15-cv-00105 JMS RLP, based on malicious prosecution, abuse of process, defamation, intentional

8    infliction of emotional distress and false light invasion of privacy (the "Malicious Prosecution

9    Action").

10          c.     Jeffrey Herman and Mark Gallagher, named above as defendants in the

11    Malicious Prosecution Action, were the lawyers representing Egan and who filed the Action against

12    DAN.  DAN asserts that the fact that the Action was a malicious sham and part of a scheme to

13    extort money from others was made apparent in discovery.  Tellingly, the falsity of the claims was

14    later admitted by Egan's lawyers Herman and Gallagher.  Herman and Gallagher paid DAN a seven-

15    figure monetary settlement and also issued written apologies to DAN.  Herman states in his

16    apology:

17         I sincerely apologize for bringing lawsuits against you on behalf of my former client

18         Michael Egan. . . .  Based on what I know now, I believe that I participated in

19         making what I now know to be untrue and provably false allegations against you.

20         Had I known what I learned after filing the lawsuits, I never would have filed these

21         claims against you.  I deeply regret the pain, suffering and damage the lawsuits and

22         publicity have caused you, and your family, friends and colleagues.  [¶]  I sincerely

23         regret my role in this matter and for the harm that I caused.

24          d.     The Malicious Prosecution Action has been stayed by 11 U.S.C. § 362(a)

25    since the Petition Date.

26         2.     The facts asserted by Egan concerning his alleged claims against DAN are set forth

27    in the Complaint, a copy of which is attached to this Motion and the Trustee Decl. as Exhibit 2.

28

PRINTED ON
RECYCLED PAPER

3.      The facts asserted by DAN concerning his defenses to Egan's alleged claims against him and in support of DAN's malicious prosecution and abuse of process claims against Egan are set forth in the Malicious Prosecution Action, a copy of which (excluding exhibits) is attached to this Motion and the Trustee Decl. as <u>Exhibit 3</u>.

## THE PROPOSED COMPROMISE, SETTLEMENT AND RELEASE OF CLAIMS

4.      The operative terms of the Settlement Agreement are as follows:[4]

**Definitions.**   For purposes of the Settlement Agreement, all terms not otherwise defined therein are defined as follows:

a.      **"Claim or "Claims"** means any right to payment, damages, actions, causes of action (whether arising, among other things, by the Action, the Malicious Prosecution Action, contract, statute, tort or equity), obligations, attorneys' fees, indemnities, subrogations, duties, demands, controversies and liabilities of every nature, at law and in equity, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether known or unknown, suspected or unsuspected, in existence as of the Petition Date.

b.      **"Effective Date"** means the first date on which each of the following has occurred: (i) the Parties have executed this Settlement Agreement where indicated below; and (ii) the Bankruptcy Court has entered a Final Order, which order shall be in form and substance reasonably acceptable to the Parties, approving this Settlement Agreement.  If the Effective Date does not occur within six months after the date first set forth above, unless such date is extended by a writing signed by all Parties prior to the expiration of the six month period, then this Settlement Agreement shall become null and void, and the Parties shall be returned to the *status quo ante* as if this Settlement Agreement had never been executed, including the recitals herein.

c.      **"Final Order"** means an order, decree or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended, and as to

---

[4] All interested parties are encouraged to read the Settlement Agreement in its entirety.  To the extent that there is any distinction between the summary of the Settlement Agreement set forth in this Motion and the Settlement Agreement itself, the express terms of the Settlement Agreement will control.

PRINTED ON
RECYCLED PAPER

which order, decree or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing has been taken or is pending. A Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, or the time to do any of the foregoing has not yet expired, but as to which the Parties, in their sole and absolute discretion, elect to proceed with the Effective Date.

        **d.**    **"Settlement Payment"** means the payment of the net sum of $5,000.00 by DAN to the Estate, up to the total sum of $21,150.00, if any exemption is claimed and ultimately allowed.

        **Settlement of the Claims.** In full and final settlement of any and all (i) Claims held by the Estate against DAN and (ii) Claims asserted by DAN against the Estate, the Estate and the Trustee shall release all Claims against DAN, DAN shall pay the Settlement Payment to the Estate, and DAN shall release all Claims against the Estate and the Trustee. DAN shall deliver $5,000.00 to the Trustee by cashier's check, wire or certified funds within five (5) business days of the Effective Date, and will deliver additional funds up to $16,150.00 as set forth above, if, as and when necessary.

      5.    In addition, the Bankruptcy Estate and DAN will exchange mutual general releases between them, which releases exclude only claims and obligations arising under the Settlement Agreement, and DAN's claims against Egan in his individual/personal capacity, all of which claims are specifically reserved.

## THE AGREEMENT SHOULD BE APPROVED UNDER THE
## FOUR PART TEST GOVERNING APPROVAL OF COMPROMISES

      Decisional law regarding the exercise of a bankruptcy court's discretion in determining whether a compromise satisfies the reasonableness standard is "remarkably consistent in establishing that there are but four considerations which a court must address." *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987). These considerations are:

1      (1)    the probability of success in the litigation;

2      (2)    the complexity of the litigation involved, and the expense, inconvenience and delay

3   necessarily attending it;

4      (3)    the likely difficulty in collection; and

5      (4)    the paramount interest of creditors.

6   *In re A&C Properties, Inc.*, 784 F.2d 1377, 1381 (9th Cir. 1986). Each of these factors

7   militate in favor of approving the proposed settlement.

8                  **THE NEUMAN CLAIMS**

9      As set forth herein, DAN has filed a proof of claim against Egan and the Bankruptcy Estate

10  in excess of $10,700,000.00 million (plus potential punitive damages). Based upon the facts and

11  law set forth in the Malicious Prosecution Action (Ex. 3 to the Motion and Trustee Decl.), it

12  appears to the Trustee that DAN has valid claims against Egan and the Bankruptcy Estate in a

13  substantial amount. Under the Settlement Agreement, DAN has agreed to release these claims

14  against the Bankruptcy Estate, and pay the Bankruptcy Estate the net sum of $5,000.00.

15      **A.**    **Probability of Success of the DAN Claims Against Egan and the Bankruptcy**

16           **Estate**

17      As set forth in the Malicious Prosecution Action, DAN is very confident that if forced to

18  litigate the Malicious Prosecution Claims, the claims will ultimately be allowed in a substantial

19  amount. Based upon the state of the record and his evaluation of the facts and law, the Trustee

20  believes that the probability of success/allowance of the GA Malicious Prosecution Claims is high.

21      **B.**    **Cost, Complexity and Delay**

22      If it were necessary for the Bankruptcy Estate to go to trial to defend the DAN claims, the

23  cost would be substantial, the funding for which does not presently exist. Moreover, the outcome is

24  likely to favor DAN.

25      **C.**    **Difficulty In Collection**

26      Here, this factor is not applicable, as the DAN claims are against the Bankruptcy Estate.

27

28  / / / / /

**D.**    **The Interest Of Creditors**

The final part of the analysis involves an evaluation of whether the settlement is in the best interests of creditors. See generally, *In re Flight Trans. Corp. Securities Litigation*, 730 F.2d 1128, 1135-1136 (8th Cir. 1984). This portion of the proposed settlement (e.g., the DAN consideration being received by the Bankruptcy Estate) results in the release of asserted claims of over $10,700,000.00 million against the Bankruptcy Estate, plus cash consideration of $5,000.00. Accordingly, the Trustee submits that the proposed settlement is in the best interest of the creditors of the Bankruptcy Estate. In exchange, as set forth below, the Bankruptcy Estate is releasing claims against DAN which appear to have little or no value. In sum, the Trustee submits that the proposed settlement is objectively reasonable under the facts and circumstances presented.

## THE EGAN CLAIMS

The alleged Egan claims against DAN were alleged to occur over 16 years ago, the claims have been withdrawn and based upon the record proven false, and Egan's former counsel issued a written public apology acknowledging that the alleged claims were false ***and*** paid DAN a seven figure settlement for filing the specious claims against DAN. In exchange for DAN'S release of claims, the evidence in support of which establishes a claim in excess of $10,700,000.00 million (plus potential punitive damages), along with a payment to the Bankruptcy Estate of the net sum of $5,000.00, subject to Bankruptcy Court approval, the Trustee, in the exercise of his considered and reasonable business judgment, has agreed to release and compromise the claims asserted by Egan against DAN.

**A.**    **Probability of Success of Egan's Claims Against DAN**

The Trustee submits that based upon the record of the claims set forth in the District Court litigation and attached hereto, the probability of success concerning any prosecution of such claims is very low or nonexistent. In addition to significant statute of limitation problems, the record reflects that DAN was not in Hawaii when Egan claims he was assaulted by DAN, and Egan's former lawyers are on record admitting the claims were fabricated, and paid DAN a seven figure settlement to resolve their liability to DAN for filing such claims.

/ / / / /

PRINTED ON
RECYCLED PAPER

**B.    Cost, Complexity and Delay**

In addition to the extremely low probability of success on the merits, pursuing any affirmative claims against DAN or defending the malicious prosecution/abuse of process claims against Egan and the Bankruptcy Estate would likely be protracted and expensive, based upon the nature of the claims and the damages involved. In addition, there would likely be substantial delay in achieving a final resolution, several years including likely appeals.

**C.    Difficulty in Collection**

Here, this factor is not applicable, as DAN can likely satisfy any claims.

**D.    The Interest of Creditors**

The final part of the analysis involves an evaluation of whether the settlement is in the best interests of creditors. See generally, *In re Flight Trans. Corp. Securities Litigation*, 730 F.2d 1128, 1135-1136 (8th Cir. 1984). This portion of the proposed settlement results in the release of claims that have been proven to have an extremely low probability of success, in exchange for a release of claims likely worth $10,700,000.00 million or more, plus a cash payment to the Bankruptcy Estate of $5,000.00. In sum, the Trustee submits that the proposed settlement is objectively reasonable under the facts and circumstances presented.

## THIS COURT SHOULD EXERCISE ITS DISCRETION

## AND APPROVE THE AGREEMENT BETWEEN THE TRUSTEE AND GA

Here, the settlement contemplated by the Settlement Agreement resolves the claims between the Bankruptcy Estate on the one hand, and DAN on the other, as they relate to the various referenced claims and causes of action described herein and in the Settlement Agreement. Compromises that satisfy the "reasonableness standard" should be approved.

Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." By its own terms, Bankruptcy Rule 9019(a) commits the approval or rejection of a compromise to the sound discretion of the Bankruptcy Court.

/ / / / /

1

## CONCLUSION

2    For all of the forgoing reasons, the Trustee prays for an order granting the Motion and

3 approving the Settlement Agreement, and for such other and further relief that the Court may deem

4 just and proper.

5 Dated: April 8, 2016

6
                                                        _____
7                                                       LENARD E. SCHWARTZER
                                                        Trustee
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "1"

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made as of this _____ day of April, 2016, by and between Lenard E. Schwartzer, solely in his capacity as the duly appointed chapter 7 trustee ("Trustee") of the bankruptcy estate (the "Estate") of Michael F. Egan, III (the "Debtor"), and David Alexander Neuman (hereinafter "DAN"). The Trustee and DAN are sometimes collectively referred to hereinafter as the "Parties" or individually as a "Party".

## RECITALS

A.    On April 21, 2014, Debtor filed an action in the United States District Court for the District of Hawaii entitled *Michael F. Egan, III v. David Alexander Neuman*, U.S.D.C., District of Hawaii, Case No. 14-cv-00190-SOM-BMK (the "Action"), asserting various tort claims.

B.    On May 15, 2014, DAN filed a motion to dismiss [Dkt. No. 10] and served Debtor's litigation counsel with a Rule 11 motion for sanctions in the Action pursuant to Federal Rule of Civil Procedure 11 asserting that the Action was baseless, fraudulent and malicious. On June 4, 2014, the last day of the Rule 11 safe harbor period, Debtor's litigation counsel voluntarily dismissed the Action, without prejudice. DAN asserts that the dismissal of the Action was done to avoid almost certain defeat in connection with the Rule 11 motion and an award of significant sanctions.

C.    As of the date of this Settlement Agreement, Debtor has no action(s) pending against DAN.

D.    On March 30, 2015, DAN filed an action against Debtor in the United States District Court for the District of Hawaii entitled, *David Alexander Neuman v. Jeffrey Marc Herman; Herman Law Firm, P.A.; Mark F Gallagher and Michael Egan, III*, U.S.D.C., District of Hawaii, Case No. 1:15-cv-00105-JMS-RLP, based on malicious prosecution, abuse of process, defamation, intentional infliction of emotional distress and false light invasion of privacy resulting from the acts leading up to the filing of the Action, the filing of the Action and dismissal of the Action (the "Malicious Prosecution Action"). Jeffrey Marc Herman and Mark F. Gallagher were Debtor's litigation counsel in the Action.

E.    In response, Debtor's litigation counsel immediately requested to mediate the dispute with DAN. The claims against the lawyers were settled for a seven figure settlement payment. Moreover, the lawyers both issued written apologies to DAN for bringing the Action in the first place because of the untrue and provably false allegations contained in the Action.

F.    DAN asserts that in order to avoid the Malicious Prosecution Action, Debtor commenced this bankruptcy case by filing a voluntary petition for relief under chapter 7 of the Bankruptcy Code (the "Petition") on November 18, 2015 (the "Petition Date"), in the United States Bankruptcy Court for the District of Nevada in Las Vegas (the "Bankruptcy Court"), Case No. 15-16493-ABL (the "Bankruptcy Case").

F.    In Debtor's Schedule B, filed along with the Petition, Debtor scheduled under the category of Other Contingent and Unliquidated Claims of Every Nature, Including Tax Refunds,

1

*Exhibit "1"*

Counterclaims of the Debtor, and Rights of Setoff Claims - "Various claims against David Neuman". Debtor set forth the value of the alleged claims as "unknown".

G.      Lenard E. Schwartzer was thereafter appointed as chapter 7 trustee in the Bankruptcy Case.

H.      Pursuant to 11 U.S.C. § 541, all of Debtor's Claims (defined below) against DAN, including but not limited to the claims set forth in the Action or Schedule B, are property of the Estate and may be sold, settled and/or compromised by the Trustee, subject to Bankruptcy Court approval.

I.      On December 8, 2015, Debtor was sentenced to 24 months in federal prison based on his felony conviction in connection with a Ponzi scheme. Debtor is currently serving his sentence at the Federal Penitentiary in Duluth, Minnesota.

J.      On April 5, 2016, 2016 DAN filed a proof of claim in the Bankruptcy Case in the amount of $10,700.000.00 ("DAN Proof of Claim").

K.      After good faith negotiations, the Parties have agreed to compromise and settle the Claims (defined below) on the terms and conditions set forth in this Settlement Agreement

NOW, THEREFORE, without any admission of liability whatsoever, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually covenanted and agreed by the Parties as follows, subject to Bankruptcy Court approval and no claim of exemption:

## AGREEMENT

1.      Definitions. For purposes of this Settlement Agreement, all terms not otherwise defined herein are defined as follows:

a.      "Claim" or "Claims" means any right to payment, damages, actions, causes of action (whether arising, among other things, by the Action, the Malicious Prosecution Action, contract, statute, tort or equity), obligations, attorneys' fees, indemnities, subrogations, duties, demands, controversies and liabilities of every nature, at law and in equity, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether known or unknown, suspected or unsuspected, in existence as of the Petition Date.

b.      "Effective Date" means the first date on which each of the following has occurred: (i) the Parties have executed the Settlement Agreement where indicated below; and (ii) the Bankruptcy Court has entered a Final Order, which order shall be in form and substance reasonably acceptable to the Parties, approving this Settlement Agreement. If the Effective Date does not occur within six months after the date first set forth above, unless such date is extended by a writing signed by all Parties prior to the expiration of the six month period, then this Settlement Agreement shall become null and void, and the Parties shall be returned to the status quo ante as if this Settlement Agreement had never been executed, including the recitals herein.

c.    "Final Order" means an order, decree or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended, and as to which order, decree or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing has been taken or is pending. A Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, or the time to do any of the foregoing has not yet expired, but as to which the Parties, in their sole and absolute discretion, elect to proceed with the Effective Date.

d.    "Settlement Payment" means the payment of the net sum of $5,000.00 by DAN to the Estate, up to the total sum of $21,150.00, if any exemption is claimed by the Debtor and ultimately allowed.

2.    Settlement of the Claims. In full and final settlement of any and all (i) Claims held by the Estate against DAN and (ii) Claims asserted by DAN against the Estate, the Estate and the Trustee shall release all Claims against DAN, DAN shall pay the Settlement Payment to the Estate, and DAN shall release all Claims against the Estate and the Trustee. DAN shall deliver $5,000.00 to the Trustee by cashier's check, wire or certified funds within five (5) business days of the Effective Date, and will deliver additional funds up to $16,150.00 as set forth above, if, as and when necessary.

3.    Release of Claims by the Estate. Excepting only the rights and obligations arising under this Settlement Agreement (the "Reserved Estate Claims"), on the Effective Date, the Estate, acting on its own behalf and on behalf of each of its past and present predecessors, and successors, and the Trustee (solely in his capacity as Trustee of the Estate) (the "Estate Releasing Parties"), shall and do hereby, release and forever discharge DAN and, as the case may be, each and all of his present or former agents, successors, heirs, beneficiaries and attorneys (the "DAN Released Parties"), from any and all Claims that the Estate Releasing Parties, or any of them, has, had, or may have against the DAN Released Parties, or any of them, excepting only the Reserved Estate Claims (the "Estate Released Claims"). Without in any way limiting the scope of the foregoing release, the Estate Releasing Parties, and each of them, covenant with the DAN Released Parties that they will forever refrain from instituting, pursuing or in any way asserting or threatening to assert in any jurisdiction, federal, state or local, foreign or domestic, any Estate Released Claims. This Settlement Agreement shall constitute a full and complete defense by the DAN Released Parties, or any of them, to any such Estate Released Claim or any other proceeding which may be brought by or on behalf of the Estate Releasing Parties, or any of them, concerning an Estate Released Claim.

4.    Release of Claims of DAN. Excepting only the rights and obligations arising under this Settlement Agreement and any Claims against Debtor personally (the "DAN Reserved Claims"), on the Effective Date, DAN and, as the case may be, each and all of his agents, successors, heirs, beneficiaries and attorneys (the "DAN Releasing Parties"), shall and does hereby, release and forever discharge the Estate and the Trustee and, as the case may be, each and all of their present or former trustees, agents, predecessors, successors, heirs, beneficiaries and attorneys (but excluding Debtor Michael F. Egan) (the "Estate Released Parties"), from any and all Claims that the DAN Releasing Parties, or any of them, has, had, or may have against the

3

Estate Released Parties (the "DAN Released Claims"). Without in anyway limiting the scope of the foregoing release, the DAN Releasing Parties, and each of them, covenant with the Estate Released Parties that they will forever refrain from instituting, pursuing or in any way asserting or threatening to assert in any jurisdiction, federal, state or local, foreign or domestic, any DAN Released Claims against the Estate Released Parties. This Settlement Agreement shall constitute a full and complete defense to any such DAN Released Claim or any other proceeding which may be brought by or on behalf of the DAN Releasing Parties, or any of them, against an Estate Released Party, concerning a DAN Released Claim. For the avoidance of doubt, it is understood and expressly acknowledged by the Parties that the DAN Released Claims do not release any Claims that DAN has or may assert against the Debtor Michael F. Egan, III in his personal/individual capacity, all of which Claims are expressly reserved by DAN under this Settlement Agreement or otherwise

    5.    Waiver of Civil Code §1542. The Estate Releasing Parties and the DAN Releasing Parties are referred to collectively hereinafter as the "Releasing Parties" and the Estate Reserved Claims and the DAN Reserved Claims are referred to collectively as the "Reserved Claims". By this Settlement Agreement, the Releasing Parties, and each of them expressly waive and relinquish any and all protections provided under Section 1542 of the California Civil Code and any all similar rights, rules, regulations, and provisions of the laws of other state and federal jurisdictions, as such pertains to the Estate Released Claims and the DAN Released Claims only. Each of the Releasing Parties represents, acknowledges and agrees that it has been advised by its legal counsel of, and is familiar with, and understands the effect of Section 1542 of the California Civil Code, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Each of the Releasing Parties is aware that hereafter it may discover claims presently unknown or undisclosed to it, facts in addition to or different from those which it now knows or believes to be true, and/or claims in its favor of which such releasing party currently is unaware. Nevertheless, by this Settlement Agreement, each of the Releasing Parties (i) expressly intends for all of such claims included within the definitions of the Estate Released Claims and the DAN Released Claims, if any (but no Reserved Claims are released), to be included within the scope of the foregoing releases and such releases constitute a full, complete, voluntary, absolute, and general release of all such claims; and (ii) expressly acknowledges that its waiver and relinquishment of rights under Section 1542 of the California Civil Code and all similar rights, rules, regulations, and provisions is an essential element of the consideration provided to the Released Parties by this Settlement Agreement and that, without such waiver and relinquishment, the Released Parties would not have executed this Settlement Agreement or agreed to its terms.

    6.    Mutual Representations, Covenants and Warranties. Each Party represents, warrants and agrees with the other Party as follows:

    a.    Independent Advice. They have received independent legal advice from its attorneys with respect to each of the matters contained herein, including the advisability of

making the settlement provided for herein, the advisability of executing this Settlement Agreement and the meaning of California Civil Code § 1542

b.    Reliance. Except as expressly stated in this Settlement Agreement, neither he, she or it nor any of their officers, members, managers, agents, partners, employees, representatives, or attorneys has made any statement or representation to any other Party regarding any fact relied upon in entering into this Settlement Agreement, and it is not relying upon any statement, representation or promise of any other Party (or of any officer, agent, employee, representative, or attorney for any other Party) in executing this Settlement Agreement.

c.    Diligence and Investigation. They have made such investigation of the facts pertaining to this settlement and this Settlement Agreement and of all the matters pertaining thereto as it deems necessary.

d.    Understanding. They have read this Settlement Agreement and understand the contents hereof.

e.    No Assignment. There has been no assignment, sale or transfer, by operation of law or otherwise, of any claim, right, cause of action, demand, obligation, liability or interest released by it as provided herein.

f.    Authority. They have full and complete authority to enter into and execute this Settlement Agreement under the terms set forth herein, and in the case of the Trustee, he shall have such authority upon approval of this Settlement Agreement by the Bankruptcy Court.

7.    No Adverse Construction or Admission. This Settlement Agreement does not constitute an admission of any liability of any kind by any Party and the releases and other terms provided for herein are made, executed, given and accepted as part of a compromise and settlement of disputed claims. No provision(s) of this Settlement Agreement, nor any acceptance of the benefits thereof by or on behalf of any of the Parties, shall be construed or deemed to be evidence of an admission of any fact, matter, thing or liability of any kind to any other Party. Each of the Parties deny any liability of any kind to any other party for any purpose, and this settlement is made solely and entirely as a compromise and for the purpose of fully and finally resolving the disputed matters referred to herein. Neither this Settlement Agreement nor any term(s) thereof shall be offered or received as evidence in any proceeding in any forum as an admission of any liability or wrongdoing on the part of any of the Parties.

8.    Binding on Successors and Assigns. This Settlement Agreement shall be binding not only upon the Parties, but, as the case may be, also upon their heirs, assigns, beneficiaries, holders in due course, representatives, trustees, affiliates, principals, agents, shareholders, officers, directors, employees, and all other successors-in-interest. The releases given herein shall survive any termination of this Settlement Agreement after the Effective Date.

9.    Entire Agreement; Amendment. The Settlement Agreement and any attachments or exhibits hereto, sets forth the entire understanding between and among the Parties relating to the subject matter contained herein and supersedes all previous oral or written proposals, negotiations, representations, or understandings concerning the subject matter. The Settlement

11366-01/1671593.doc

Agreement may not be modified, amended or discharged except by a subsequent written agreement signed by all of the Parties. Each Party expressly disclaims any right to enforce or claim the effectiveness of any oral modification of the Settlement Agreement based upon a course of dealing, waiver, reliance, estoppel or other similar theory of law.

10.    Waiver of Costs. Each Party shall be responsible for its own attorneys' fees and any other costs incurred and/or accrued by it in connection with the matters related hereto and each Party specifically waives any and all claim(s) against any other Party hereto for the recovery of the same.

11.    Attorneys' Fees. In the event of any action or proceeding brought by any Party against another Party to enforce or to interpret this Settlement Agreement, the prevailing Party shall be entitled to recover all reasonable costs and expenses including its attorneys' fees and experts' fees and costs in such action or proceeding. The prevailing Party shall be determined by the court or mediator based upon an assessment of which Party's major arguments made or positions taken in the proceedings could fairly be said to have prevailed on major disputed issues in the court's decision. If the party which shall have commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of such other Party, then such other Party shall be deemed the prevailing Party.

12.    Bankruptcy Court Jurisdiction and Applicable Law. Each Party consents to the exclusive jurisdiction of the Bankruptcy Court over any matter, action, or proceeding relating to this Settlement Agreement, including any proceeding brought in connection with this Settlement Agreement, and agrees that the Bankruptcy Court shall be the exclusive forum to hear, determine, and enter appropriate orders and judgments in all such matters, actions, or proceedings, provided, however, that in the event the Bankruptcy Court refuses to exercise jurisdiction over any proceeding related to or concerning this Settlement Agreement, the Parties consent to the jurisdiction of any state or federal court located in Los Angeles County, California or Clark County, Nevada that may properly exercise jurisdiction over any such proceeding. This Settlement Agreement shall be governed in all respects, including validity, interpretation, and effect, by the Bankruptcy Code and the laws of the State of California, without giving effect to the principles of choice of law or conflicts of law thereof. The Parties hereto irrevocably waive any right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Settlement Agreement or the transactions contemplated hereby. Notwithstanding anything contained in this Section, all disputes involving matters arising in connection with this Settlement Agreement will be brought as contested matters and not as adversary proceedings.

13.    Rules of Construction. The Parties, including their counsel, have participated in the preparation of this Settlement Agreement, and this Settlement Agreement is the result of the joint efforts of the Parties. This Settlement Agreement has been accepted and approved as to its form by all Parties and upon the advice of their respective counsel. Accordingly, any uncertainty or ambiguity existing in this Settlement Agreement shall not be interpreted' against any Party as a result of the manner of the preparation of this Settlement Agreement. Each party to this Settlement Agreement agrees that any statute or rule of construction providing that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Settlement Agreement and are hereby waived.

14. **No Third Parties Benefitted.** Except for the releases that extend to the Parties, this Settlement Agreement is made for the sole benefit and protection of the Parties hereto and the successors and assigns of each Party, and no other person shall have any right of action or right to rely thereon, and the Parties hereto agree that nothing contained in this Settlement Agreement shall be construed to vest in any other person or entity, any interest in or claim upon the rights and interests of the Parties hereunder or in any proceeds thereof.

15. **Non-Waiver.** No waiver of any of the provisions of this Settlement Agreement shall be deemed or shall constitute a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

16. **Bankruptcy Court Approval and Time.** Time is of the essence in this Settlement Agreement and Bankruptcy Court approval shall be sought immediately and a motion to approve this Settlement Agreement shall be filed with the Bankruptcy Court no later than two weeks after the Settlement Agreement is returned to the Trustee signed by DAM.

17. **Headings.** Headings contained in this Settlement Agreement are for reference purposes only and shall be given no weight in the construction of this Settlement Agreement.

18. **Gender and Number.** All references herein to the masculine gender shall be deemed to apply equally to the feminine and neuter genders and vice versa. All references herein to the singular shall be deemed to apply equally to the plural and vice versa.

19. **Severability.** Should any non-material term, provision or paragraph of this Settlement Agreement be determined to be illegal or void or of no force and effect, the balance of this Settlement Agreement shall survive. Should the Parties be unable to agree as to whether any term, provision or paragraph of this Settlement Agreement that may be determined to be illegal or void or of no force and effect is material or not, such dispute shall be resolved in accordance with Section 12 of this Settlement Agreement.

20. **Counterparts.** This Settlement Agreement may be executed in counterparts. The Parties further agree that this Settlement Agreement may be executed by facsimile or electronic signature, with such facsimile or electronic signature to have the same force, validity and effect as an original signature.

21. **Execution.** This Settlement Agreement shall be a valid and binding agreement only when executed and delivered to the Parties hereto (subject to Bankruptcy Court approval and the occurrence of the Effective Date). Subject to the foregoing limitation, delivery by facsimile or other electronic transmission shall be sufficient to render the Settlement Agreement valid and binding.

22. **Further Assurances.** Each Party shall take such additional reasonable and necessary acts to accomplish the purposes of this Settlement Agreement, including the filing and prosecution by the Trustee in the Bankruptcy Case of a motion for approval of this Settlement Agreement.

7

23.    <u>Recitals</u>. The Recitals contained herein shall be accorded no evidentiary value by any of the Parties or a court of competent jurisdiction, and may be used solely for purposes of interpreting this Settlement Agreement.

DATED: _4/6/16_____

                LENARD E. SCHWARTZER, as Chapter 7
                Trustee of the Bankruptcy Estate of Michael F.
                Egan, III

DATED: _4/6/16_____

                DAVID ALEXANDER NEUMAN

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "2"

Mark F. Gallagher
Hawaii Bar No.: 6016
mgallagher@hawaiiantel.net
66 Kaiholu Place
Kailua, Hawaii 96734
(808) 535-1500

HERMAN LAW
3351 NW Boca Raton Boulevard
Boca Raton, FL 33431
Tel:  305-931-2200
Fax:  305-931-0877
Jeff Herman
Florida Bar No. 521647
jherman@hermanlaw.com
(pending application for *pro hac vice* admission)
Dennis E. Siegel
Florida Bar No. 258131
dsiegel@hermanlaw.com
(pending application for *pro hac vice* admission)
Lee Gill Cohen
Florida Bar No. 825670
lcohen@hermanlaw.com
(pending application for *pro hac vice* admission)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MICHAEL F. EGAN, III, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: _____ |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT** |
| DAVID ALEXANDER NEUMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff, MICHAEL F. EGAN, III, hereby sues Defendant, DAVID ALEXANDER

NEUMAN, and states the following:

*Exhibit "2"*

Page 2

## INTRODUCTION

Defendant, DAVID ALEXANDER NEUMAN, manipulated his power, wealth, and position in the entertainment industry to sexually abuse and exploit the underage Plaintiff through the use of drugs, alcohol, threats, and inducements which resulted in Plaintiff suffering catastrophic psychological and emotional injuries. Defendant Neuman did so as part of a group of adult males similarly positioned in the entertainment industry that maintained and exploited boys in a sordid sex ring. A Hollywood mogul must not use his position to sexually exploit underage actors.

## JURISDICTION, VENUE, AND PARTIES

1.      Plaintiff, MICHAEL F. EGAN, III, is a citizen and resident of Clark County, Nevada, and is *sui juris*.

2.      Defendant, DAVID ALEXANDER NEUMAN, is a citizen and resident of the State of California and is *sui juris*.

3.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000.00 and the action is between citizens of different states.

4.      A substantial part of the acts, events, or omissions giving rise to Plaintiff's claims arose in and around Kailua, Hawaii. Therefore, pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the District of Hawaii.

## FACTS COMMON TO EACH COUNT
### *Plaintiff Is Introduced To The M & C Estate*

5.      When Plaintiff was in elementary school in the Midwest, he began modeling for print advertising. As time passed, he performed in school plays and was ultimately encouraged to pursue acting professionally. For a period of time, he moved with his mother to New York and engaged in modeling for print advertising and in television commercials.

6.    When Plaintiff was 14 or 15, he moved to the Los Angeles, California, area with his family at the suggestion of his talent manager to further his acting career, and continued to model. He dreamed and aspired to have acting become his career.

7.    Plaintiff attended a very small private high school in the San Fernando Valley in the Los Angeles, California, area. Plaintiff was short and of a slight stature.

8.    There were approximately four children in Plaintiff's grade, one of whom was Scott Shackley (Scott) who Plaintiff considered a close friend. In early or mid-1998, Scott introduced Plaintiff to his older brother Chad Shackley (Chad) who, upon information and belief, was Scott's caretaker. Chad resided in a mansion in Encino, California, which was commonly referred to as the M & C Estate.  Plaintiff would often go to the M & C Estate to visit Scott. Marc Collins-Rector (Collins-Rector) also resided in the M & C Estate as did Chad and Scott. Upon information and belief, a sexual relationship existed between Collins-Rector and Chad.

9.    At the time, upon information and belief, Collins-Rector was the Chairperson of the Board of Directors of an online entertainment business known as Digital Entertainment Network (DEN) and Defendant Neuman was its president. Both Chad and Collins-Rector were principals in DEN. Collins-Rector was instrumental in promoting and marketing DEN as a commercial venture that would revolutionize television and online entertainment, and DEN was considered at the time to be in the vanguard of the growing online entertainment industry. DEN was a well-known enterprise which attracted a significant number of prominent investors, including persons and organizations that were renowned in the entertainment industry such as Defendant Neuman.

10.    In an attempt to manipulate his compliance with the sexual demands of those adults who frequented the M & C Estate, Plaintiff was placed on DEN's payroll as an actor in Royal Standard, an online television show broadcast on DEN's network, and was paid

Page 4

approximately $1,500.00 per week. Plaintiff additionally was paid approximately $600.00 per week from different accounts without any designation of job duties, title, or position. Upon information and belief, salaries of this nature were paid to many of the teenage males lured to the M & C Estate to have sex with the adults who resided there or visited there for recreational and business purposes. Plaintiff was provided the opportunity to audition for other acting, commercial, and modeling jobs. Plaintiff was promised stock in DEN, was provided with extravagant gifts, and was transported on private jets to attractive locations.

*Sordid Parties At The M & C Estate*

11.     Upon information and belief, Collins-Rector and Chad hosted many notorious parties on the grounds of the M & C Estate which were attended by numerous young males who had been lured to the M & C Estate as well as by DEN investors including Defendant Neuman. The parties were typically sordid and featured sexual contact between adult males and the many teenage boys who were present for the parties. Further, the parties included the distribution of drugs and alcoholic beverages to the teenage boys at the party. Upon information and belief, the nature of the parties was well-known and notorious among many men in the Hollywood entertainment industry.

12.     Soon after Plaintiff was introduced to Collins-Rector and Chad, he was often told by them in a bullying manner that they had "gaydar" and knew that Plaintiff was homosexual, a characterization which Plaintiff, who is heterosexual, categorically denied. He was told that he was part of the "group", referring to the numerous young males who were lured to the M & C Estate for the purpose of sexual contact with the adult males who visited the M & C Estate ostensibly for recreational and business purposes. He was advised that those adult males controlled Hollywood and would destroy his hopes and dreams of an acting career if he did not keep them happy. They threatened to "eliminate" him and his family, and told him that they were

Case 15-16493-abl   Doc 30   Entered 04/11/16 14:14:55   Page 24 of 54
Case 1:14-cv-00190-SOM-BMK   Document 1   Filed 04/21/14   Page 5 of 10   PageID #: 5

Page 5

monitoring not only his phone, but those of his family members, and asserted he would be "destroyed" if he ever disclosed the unconscionable activities that occurred at the Estate.

13.     Defendant Neuman was present for several of these threatening communications during which Plaintiff was told how the adults who resided in or frequented the M & C Estate controlled Hollywood and could decide whether Plaintiff's career aspirations and hopes would be realized. Defendant Neuman was also present during times when threats were relayed to Plaintiff concerning his and his family's well-being.

14.     The M & C Estate contained a number of bars and was replete with alcohol and drugs. The adults at the M & C Estate strenuously pressured the teenagers who were there, including Plaintiff, to ingest the copiously available drugs and alcohol. Plaintiff was often forced to consume alcoholic beverages and drugs, and was also surreptitiously administered drugs when they were placed in beverages that he consumed. Defendant Neuman was often present at the M & C Estate when these drug and alcohol-related activities were occurring and knew, or should have known, that such was taking place.

*Defendant Neuman Induced Or Coerced Plaintiff Into Sexual Activity*

15.     During the infamous and degenerate parties at the M & C Estate, the adult males engaged in sexual contacts with the Plaintiff, as well as the other boys present. Plaintiff never freely, voluntarily, and knowingly consented to these sexual interactions, and often resisted them.

16.     On several occasions when Plaintiff resisted submitting to sexual contact, Collins-Rector physically and aggressively held Plaintiff down in order to facilitate his sexual victimization.

17.     On an occasion when Plaintiff was being resistant to sexual contact, Collins-Rector called him into the master bedroom of the M & C Estate. Collins-Rector pointed a firearm

at Plaintiff and threatened to pull the trigger if his resistance to submitting to sexual contact continued. Collins-Rector then forcibly locked Plaintiff for a period of time in a gun safe which was located in a master bedroom closet.

18.     Defendant Neuman often told Plaintiff that he would find a role for him in television shows, and that he would use his connections to further Plaintiff's acting career.

19.     Defendant Neuman sexually assaulted Plaintiff on numerous occasions at the M & C Estate during the one to two year time period preceding the trips to Hawaii set forth hereafter.   Those unwanted sexual acts included sodomy, oral copulation, and fondling of genitals.   Plaintiff was approximately 15 years old when Defendant Neuman began sexually abusing and exploiting him in California.

*Acts Of Sexual Abuse And Exploitation In Hawaii*

20.     On more than one occasion, Plaintiff was flown to Hawaii when he was 17 years old.   Two of these trips took place on or between August 1, 1999, and October 31, 1999, and each time his stay lasted roughly one week.   Plaintiff traveled to Hawaii for each trip on a private jet on which Defendant Neuman was also a passenger.

21.     During the course of the first of the above-referenced trips to Hawaii, Plaintiff was repeatedly groped by Defendant Neuman in a sexual manner.   Defendant Neuman regularly insisted that Plaintiff consume alcoholic beverages and drugs.   On one occasion, Defendant Neuman attempted to induce Plaintiff to orally copulate him in the swimming pool, but the effort was halted by the interruption of another adult.

22.     On a later occasion during the first of the above-referenced trips to Hawaii when the occupants of the Estate had consumed a large amount of alcoholic beverages and ingested a significant amount of drugs, Defendant Neuman coerced Plaintiff into orally copulating him and into submitting to being orally copulated by Defendant Neuman while in the bathroom.

Case 15-16493-abl   Doc 30   Entered 04/11/16 14:14:55   Page 26 of 54
Case 1:14-cv-00190-SOM-BMK   Document 1   Filed 04/21/14   Page 7 of 10   PageID #: 7

Page 7

23.     Defendant Neuman also forcefully sodomized Plaintiff.

24.     On approximately the second day of the second of the above-referenced trips to Hawaii, Defendant Neuman escorted Plaintiff to his room and masturbated Plaintiff's penis. Defendant Neuman then orally copulated Plaintiff.  Defendant Neuman then masturbated and ejaculated onto Plaintiff's body.

25.     Later that evening, Defendant caused Plaintiff to consume more alcoholic beverages and drugs, and then forcefully sodomized Plaintiff in Defendant Neuman's room.

26.     Plaintiff did not consent to any of the sexual contacts that he had with Defendant Neuman in Hawaii, and during each of them was under the influence of alcohol and mind-altering drugs to the extent that he was incapable of knowingly and intelligently consenting to the sexual contact.

27.     Upon information and belief, Collins-Rector was criminally prosecuted and convicted of crimes stemming from the sexual abuse of another young male in a similar manner and under similar circumstances, and is now a registered sexual offender.

28.     Upon information and belief, Collins-Rector and Chad have had other civil lawsuits filed against them based upon having sexually abused or assaulted other underage males in a similar manner and under similar circumstances.

29.     As an actual, legal, and proximate result of the sexual abuse of Plaintiff by Defendant Neuman, Plaintiff has suffered, is suffering, and will continue to suffer: a) severe psychological, mental, and emotional injuries and trauma; b) expenses for counseling and therapy for the psychological, mental and emotional injuries and trauma; c) loss of enjoyment of life; d) shame, humiliation, and indignity; and e) substantial future expenses for counseling.

30.     Defendant Neuman's sexual exploitation and abuse of Plaintiff in Hawaii was accomplished through the employment of threats, intimidation, and the administration of mind-

Page 8

altering substances to obtain Plaintiff's submission. Defendant Neuman acted wantonly, oppressively, or with such malice as implied a spirit of mischief or criminal indifference to civil obligations. Defendant Neuman's actions in sexually exploiting and abusing Plaintiff involved or included willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

**COUNT I**
**(Intentional Infliction of Emotional Distress)**

31.    Plaintiff repeats and restates the facts set forth in paragraphs 5 through 30 above.

32.    One or more of the acts of Defendant Neuman which caused the egregious harm that Plaintiff has suffered were intentional, were outrageous, and did cause extreme emotional distress to Plaintiff.

WHEREFORE, Plaintiff demands against Defendant Neuman an amount exceeding $75,000.00 for: 1) compensatory damages; 2) punitive and exemplary damages; 3) costs of the suit; 4) reasonable attorney's fees; 5) post-judgment interest as permitted by law; and 6) such other and further relief as the Court may deem proper.

**COUNT II**
**(Battery)**

33.    Plaintiff repeats and restates the facts set forth in paragraphs 5 through 30 above.

34.    On one or more separate occasions, Defendant Neuman did act with the intent to cause a nonconsensual, harmful, or offensive contact with Plaintiff, and the contact did occur.

WHEREFORE, Plaintiff demands against Defendant Neuman an amount exceeding $75,000.00 for: 1) compensatory damages; 2) punitive and exemplary damages; 3) costs of the suit; 4) reasonable attorney's fees; 5) post-judgment interest as permitted by law; and 6) such other and further relief as the Court may deem proper.

Case 15-16493-abl    Doc 30    Entered 04/11/16 14:14:55    Page 28 of 54
Case 1:14-cv-00190-SOM-BMK    Document 1    Filed 04/21/14    Page 9 of 10    PageID #: 9

Page 9

### COUNT III
#### (Assault)

35.    Plaintiff repeats and restates the facts set forth in paragraphs 5 through 30 above.

36.    On one or more occasions Defendant Neuman acted with the intent to cause a nonconsensual harmful or offensive contact with, or apprehension thereof by, Plaintiff, and Plaintiff did apprehend an imminent contact of his person by Defendant Neuman.

WHEREFORE, Plaintiff demands against Defendant Neuman an amount exceeding $75,000.00 for: 1) compensatory damages; 2) punitive and exemplary damages; 3) costs of the suit; 4) reasonable attorney's fees; 5) post-judgment interest as permitted by law; and 6) such other and further relief as the Court may deem proper.

### COUNT IV
#### (Invasion of Privacy by Unreasonable Intrusion)

37.    Plaintiff repeats and restates the facts set forth in paragraphs 5 through 30 above.

38.    On one or more occasions Defendant Neuman unreasonably intruded into the solitude or seclusion of Plaintiff by intentionally intruding, physically or otherwise, upon the private affairs or concerns of Plaintiff, or upon Plaintiff's solitude or seclusion, which intrusions would be highly offensive to a reasonable person. The private affairs or concerns, or solitude or seclusion, of Plaintiff which were unreasonably intruded upon by Defendant Neuman include, but are not limited to, his bodily integrity, and his sexual choices.

WHEREFORE, Plaintiff demands against Defendant Neuman an amount exceeding $75,000.00 for: 1) compensatory damages; 2) punitive and exemplary damages; 3) costs of the suit; 4) reasonable attorney's fees; 5) post-judgment interest as permitted by law; and 6) such other and further relief as the Court may deem proper.

Case 15-16493-abl    Doc 30    Entered 04/11/16 14:14:55    Page 29 of 54
Case 1:14-cv-00190-SOM-BMK    Document 1    Filed 04/21/14    Page 10 of 10    PageID #: 10

Page 10

## FILING OF CERTIFICATE OF MERIT

39.    Pursuant to HRS §657-1.8(d), Plaintiff has obtained and is filing a certificate of merit with the Clerk of the United States District Court for the District of Hawaii. The manner of the filing of the certificate of merit is subject to a ruling by this Court pursuant to Plaintiff's Motion For Leave Of Court To File Certificate of Merit Under Seal In A Traditional Paper Format.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in this action.

Dated:  April 21, 2014.

Respectfully submitted,

Mark F. Gallagher
Hawaii Bar No.: 6016
66 Kaiholu Place
Kailua, Hawaii 96734
mgallagher@hawaiiantel.net
(808)535-1500

By:  __/s/ Mark F. Gallagher__
        Mark F. Gallagher

HERMAN LAW
3351 NW Boca Raton Boulevard
Boca Raton, FL 33431
Tel: 305-931-2200
Fax: 305-931-0877
www.hermanlaw.com
Jeff Herman
Florida Bar No. 521647
jherman@hermanlaw.com
(pending application for *pro hac vice* admission)
Dennis E. Siegel
Florida Bar No. 258131
dsiegel@hermanlaw.com
(pending application for *pro hac vice* admission)
Lee Gill Cohen
Florida Bar No. 825670
lcohen@hermanlaw.com
(pending application for *pro hac vice* admission)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "3"

1 CASE LOMBARDI & PETTIT
Attorneys At Law, a Law Corporation
2 John R. Dwyer, Jr.                    1445-0
jdwyer@dwyerlaw.com
3 737 Bishop Street, Suite 2600
Mauka Tower
4 Honolulu, Hawaii 96813
Telephone: (808) 286-4379
5 Facsimile: (808) 523-1888

6 GLASER WEIL FINK HOWARD
AVCHEN& SHAPIRO LLP
7 Patricia L. Glaser ****              55668
pglaser@glaserweil.com
8 Andrew Baum ****                    190397
abaum@glaserweil.com
9 Alexander Kargher ****              259262
10250 Constellation Boulevard,
10 19th Floor
Los Angeles, California 90067
11 Telephone: (310) 553-3000
Facsimile: (310) 556-2920
12
*** Subject to Pending Admission
13     *Pro Hac Vice*

14 Attorneys for Plaintiff
David Alexander Neuman

15

16               UNITED STATES DISTRICT COURT

17                  DISTRICT OF HAWAII

18 DAVID ALEXANDER NEUMAN, an        CASE NO.:
   individual,
19                                   Hon.
                 Plaintiff,
20                                   **COMPLAINT FOR:**
21 v.
                                     **1. MALICIOUS PROSECUTION**
22 JEFFREY MARC HERMAN, an           **2. ABUSE OF PROCESS**
   individual; HERMAN LAW FIRM, P.A.,**3. DEFAMATION**
23 a Florida professional association; MARK **4. INTENTIONAL INFLICTION**
   F. GALLAGHER, an individual; and  **OF EMOTIONAL DISTRESS**
24 MICHAEL EGAN, III, an individual, **5. NEGLIGENT INFLICTION OF**
                                     **EMOTIONAL DISTRESS**
25               Defendants.         **6. FALSE LIGHT INVASION OF**
                                     **PRIVACY**
26
27                                   **JURY TRIAL DEMANDED**
28

                        COMPLAINT
984341                          Exhibit "3"

Case 2:15-cv-04953-MRP-RLP Document 1 Entered 03/30/15 5 Page 2 of 54 PageID #: 2

## INTRODUCTION

1.     Last year, the defendants concocted a despicable scheme to enrich themselves by inventing and then litigating totally false claims which they would then use to extort settlement payoffs.  They decided they would hold a press conference to announce a lawsuit, and then sue plaintiff David Alexander Neuman and accuse him (and three other defendants) of horrific and repeated acts of sexual contact, violence and abuse against defendant Michael Egan ("Egan").  Their clear expectation, confirmed by their subsequent actions, was twofold.

2.     First, Mr. Neuman is informed and believes that defendants expected that rather than fight these vicious and provably false claims, Mr. Neuman would simply choose to pay defendants a sum of money to settle the claims and end the litigation.

3.     Second, Mr. Neuman – who is an openly gay executive in the entertainment industry – is also informed and believes that defendants, after initiating public prelitigation marketing and publicizing litigation against Mr. Neuman, intended to contact other gay men in the entertainment industry to intimidate and extort fraudulent settlements from those men by threatening to ruin their lives forever by falsely asserting sexual abuse of young boys and having them forever associated with the worst demonic image of a gay man, a pedophile, if they did not agree to pay to "settle" the threatened litigation.

4.     Banking on the expectation that potential targets of their scheme would settle these heinous allegations to keep them from becoming public, defendants were motivated to make their allegations as egregious as possible.  In order to do that, and compound the already vile nature of their claimed sexual abuse, defendants claimed that Mr. Neuman began abusing Egan when he was 15 years old.  By this time, however, Egan was 31 years old.  Recognizing that the applicable statute of limitations created a huge obstacle (among other obstacles) for their contemplated lawsuit, defendants chose to take advantage of a Hawaiian state law which temporarily suspended the statute of limitations for claims brought in Hawaii for

1   childhood sexual assault which occurred in that state.

2        5.    In order to take advantage of this law, however, defendants would have

3   to justify filing their suit in Hawaii.  In order to do this, they would have to not only

4   allege fictional claims of sexual abuse, but they would have to allege that this

5   purported abuse occurred in Hawaii (and thus was subject to the Hawaii statute).  In

6   other words, they would not only allege that Egan and Mr. Neuman were in Hawaii

7   together, but that while in Hawaii, Egan was sexually abused by Mr. Neuman.

8        6.    Defendants then put their plan in motion.  They announced, and then

9   held, a press conference on April 21, 2014 to publicly announce the allegations

10   against Mr. Neuman.  This press conference was well attended by the media.  Video

11   of the conference was streamed live globally and was distributed from numerous

12   sources on the internet, and the press conference received extensive coverage in the

13   electronic and print media as well (all of which remains readily available on the

14   internet today).

15        7.    At the same time, defendants filed their lawsuit in Hawaii (the "Hawaii

16   Suit") against Mr. Neuman.  In the Hawaii Suit, defendants claimed that Mr. Neuman

17   repeatedly sexually abused and exploited Egan during two separate trips to Hawaii

18   *some 15 years earlier*, in 1999.

19        8.    While defendants successfully launched their campaign to accuse

20   Mr. Neuman publicly of these horrific acts, they could not escape the fundamental

21   problem with their scheme:  The fact that the allegations were entirely made up and

22   were totally, and provably, false for a slew of reasons - beginning with the fact that

23   Mr. Neuman was ***never on any trips to Hawaii*** with Mr. Egan in 1999 or at any other

24   time.

25        9.    Additionally, defendants knew, or at least should have known, of the

26   following additional information, all of which objectively demonstrated that the

27   allegations made against Mr. Neuman were totally untrue:

28        a.    In prior litigation initiated by Egan in 2000 - ***after the claimed***

984341

*abuse by Mr. Neuman* - Egan admitted in a deposition, under
penalty of perjury and with his own counsel sitting next to him,
that he was not sexually abused by Mr. Neuman;

b.   In that same deposition, Egan admitted that he had never been to
Hawaii;

c.   Shortly after this deposition, Egan stated in an under-oath
declaration that he had only incidental social contact with
Mr. Neuman and that Mr. Neuman had always acted appropriately
towards him; and

d.   Prior to filing the complaint against Mr. Neuman, defendants'
agent had interviewed one of the individuals who was on both of
the trips to Hawaii in 1999 referenced by Egan in his complaint
and that individual stated that neither Mr. Neuman *nor* Egan were
present on either trip.

10.   Mr. Neuman responded to the Hawaii Suit by filing a Rule 12(b) motion
to dismiss and by serving a Rule 11 motion for sanctions, which collectively
presented this (and other) evidence demonstrating why Egan's claims were totally
fabricated. Once confronted with this evidence, Defendants dismissed the Hawaii
Suit and tacitly admitted that their claims were untrue. While defendants were not
able to extort a settlement from Mr. Neuman, Mr. Neuman is informed and believes
that they were able to use the threat of filing similar litigation to extort millions of
dollars in "settlements" from other prominent gay men.

11.   While the dismissal meant that the litigation against Mr. Neuman was
now over, it did nothing to rectify the tremendous damage that the allegations and
litigation caused him. As a result, Mr. Neuman has no choice but to invoke the legal
system to recover his damages, and restore his good name.

## PARTIES

12.   Plaintiff David Alexander Neuman is an individual residing in Los

984341

1  Angeles, California, with an intention to reside there indefinitely, and is therefore a

2  citizen of California.

3        13.    On information and belief, Michael F. Egan, III, is an individual residing

4  in Nevada, with an intention to reside there indefinitely, and is therefore a citizen of

5  Nevada. Egan was the plaintiff in the Hawaii Suit.

6        14.    On information and belief, Jeffrey Marc Herman is an individual residing

7  in Florida, with an intention to reside there indefinitely, and is therefore a citizen of

8  Florida. Herman was an attorney of record for Egan in the Hawaii Suit.

9        15.    On information and belief, Herman Law Firm, P.A., is a Florida

10  professional association, registered in Boca Raton, Florida, with its sole offices in

11  Boca Raton, Florida. Herman Law Firm was counsel of record for Egan in the

12  Hawaii Suit.

13        16.    On information and belief, Mark F. Gallagher is an individual residing in

14  Hawaii, with an intention to reside there indefinitely, and is therefore a citizen of

15  Hawaii. Gallagher was an attorney of record for Egan in the Hawaii Suit.

16        17.    Defendants Herman, Herman Law Firm and Gallagher are collectively

17  referred to as the "Lawyer Defendants."

18                               **JURISDICTION**

19        18.    This Court has subject matter jurisdiction over Mr. Neuman's claims

20  under 28 U.S.C. § 1332. Diversity exists as, on the one hand plaintiff Neuman is

21  citizen of California and, on the other hand, defendant Herman is a Florida citizen,

22  defendant Herman Law is a Florida private association, Egan is a Nevada citizen and

23  Gallagher is a Hawaii citizen. The amount in controversy exceeds the sum or value of

24  $75,000 exclusive of interest and costs.

25        19.    The Court has personal jurisdiction over Defendants because Defendants

26  availed themselves of this district when they filed the Hawaii Suit.

27                                 **VENUE**

28  Venue is properly in this District under 28 U.S.C. § 1391(b)(2), as a substantial part

---

4

COMPLAINT

of the events giving rise to this action occurred in this District, including but not limited to, the filing of the Hawaii Suit.

## FACTUAL ALLEGATIONS

### I.     Mr. Neuman's Background

20.     Following his *summa cum laude* graduation from UCLA, where he was elected to Phi Beta Kappa, Mr. Neuman was appointed as a White House Fellow by President Ronald Reagan, and served on the White House staff, in the Office of Cabinet Affairs.

21.     Mr. Neuman's career in media began as a management trainee at NBC in the 1980s, where he rose in the ranks to become Vice President of Current Comedy Programs and Vice President of Comedy Development, overseeing numerous Emmy-winning, hugely popular programs including Cheers, the Golden Girls, and Family Ties, among many others.

22.     Mr. Neuman took the reins of head of programming at the Channel One Network in 1992.  Channel One was a national, in-school news network reaching an audience of approximately seven million middle and high school students each day.   During Mr. Neuman's tenure there, Channel One's programming won over 100 national awards for programming, journalism, education, and community service, including one of the most prestigious awards for television news, the George Foster Peabody Award.

23.     Later, at the Walt Disney Company, Mr. Neuman was in charge of the Walt Disney Television and Touchstone Television divisions, overseeing programs including Home Improvement, Ellen, Boy Meets World, and the Wonderful World of Disney, among many others.  During Mr. Neuman's tenure he oversaw the groundbreaking "Puppy" episode of Ellen for the studio, which was watched by 42 million viewers and won an Emmy and Peabody Award.

24.     While still at the Walt Disney Company, Mr. Neuman was approached to become the president of a startup called Digital Entertainment Network (DEN), a

1  pioneer in the creation of original, television-style video content for the

2  internet.  Mr. Neuman oversaw the production division of the company that created

3  original scripted and unscripted multimedia comedy and drama programs, as well as

4  news, sports, music programming and advertising geared toward young, internet-

5  centric audiences.

6      25.    Subsequent to DEN, Neuman became the Chief Programming Officer of

7  CNN, overseeing the network's program development and talent functions, among

8  numerous other responsibilities.  Mr. Neuman actively participated in the network's

9  coverage of the events of September 11, 2001.

10     26.    Following his service at CNN, he was recruited by former Vice President

11  Al Gore and Mr. Gore's business partner, Joel Hyatt, to become the founding head of

12  programming for the startup Current TV, an innovative new multi-platform news and

13  information network, eventually sold to Al Jazeera in a deal that Forbes magazine

14  reported to be approximately $500 million.

15     27.    Mr. Neuman has followed a path of public service which began in

16  Washington, D.C.  In addition to being honored in 1998 for his public service by his

17  national fraternity, Lambda Chi Alpha, in as a recipient of its Order of Achievement,

18  in 2007 Mr. Neuman was awarded the Los Angeles Superior Court's Volunteer of the

19  Year for his 24-year tenure of volunteer advocacy for children in the dependency

20  system.

21  **II.    Defendants File The Hawaii Suit And Hold Their Press Conference**

22     28.    On information and belief, Defendants formally began their scheme on

23  April 16, 2014, when they filed a lawsuit entitled *Michael F. Egan v. Bryan Jay*

24  *Singer*, United States District Court, District of Hawaii Case Number 14-00177 (the

25  "*Singer* Case").  The *Singer* Case accused then-defendant Bryan Singer ("Singer"), a

26  successful Hollywood director, of sexually abusing Egan, when Egan was a minor, in

27  Los Angeles, California and during two trips to Hawaii in 1999.

28     29.    Upon the filing of the *Singer* Case, Defendants Egan and Herman

COMPLAINT

984341

1  conducted a press conference at the Four Seasons Hotel in Beverly Hills, California.

2  They told the press that Singer had sexually abused Egan for a period of a few years,

3  both in California and during trips, including trips to Hawaii, "where he was also

4  sexually abused."

5       30. ·   Not content with just leveling these allegations against Singer, Herman a

6  day or two later issued a press release announcing that he would be filing more sexual

7  abuse lawsuits against three other Hollywood executives whom he claimed were "part

8  of a Hollywood sex ring."  To hold the world in suspense, his press release teased that

9  the names of these three executives would be revealed at a second press conference,

10  which he scheduled for the following day (Monday, April 21).  This second press

11  conference was also scheduled for the Four Seasons Hotel in Beverly Hills,

12  California, and Herman notified the press that he would pay for valet parking for any

13  members of the press who attended the conference.  His press release also promised

14  that copies of the new lawsuits would be available at the press conference.  The full

15  text of Herman's press release stated is as follows:

16                          ***MEDIA ALERT***

17

18                 NEWS CONFERENCE MONDAY AT 2PM

19

20          HOLLYWOOD EXECUTIVES TO BE NAMED IN SEXUAL

21                 ABUSE LAWSUITS FILED MONDAY

22

23      WHAT: JEFF HERMAN (www.hermanlaw.com), a nationally-recognized

24      ·attorney for victims of sexual abuse, announces the filing of three lawsuits

25      against Hollywood executives alleging the sexual abuse of an underage boy.

26      The victim alleges that the three executives were part of a Hollywood sex ring.

27      In a lawsuit filed last week he alleged he was sexually abused by X-Men

28

984341

director Bryan Singer who was part of the Hollywood sex ring. The names of
the executives will be revealed at the news conference.

Copies of the filed complaint will be available at the news conference.

WHEN: Monday, April 21st, 2014 at 2pm (PST)

WHERE: Four Seasons Hotel in Beverly Hills

300 South Doheny Drive, Los Angeles, CA 90048

*Valet is courtesy of Herman Law (Tickets will be validated at the news
conference)

WHO: Michael Egan, his mother, and attorney Jeff Herman.

CONTACT: Kayla Repan 305-931-2200; krepan@hermanlaw.com

*See* Exhibit A.

31.     On information and belief, Herman and/or the Herman Law Firm caused
this press release to be widely circulated to various media sources. They also caused
it to be made available on the Herman Law Firm's website, where it remains available
and viewable as of the date of this Complaint.

32.     The next day, Monday April 21, 2014, Defendants filed three lawsuits in
Federal Court in Hawaii. One of those was the Hawaii Suit. The other two were filed
against Garth Ancier and Gary Goddard, both of whom are successful Hollywood
executives as well.

33.     Like the *Singer* case filed a few days earlier, the three suits filed on April
21, 2014 begin by alleging that in 1998, Egan began working as a child actor for an
online entertainment business known as Digital Entertainment Network ("DEN"). He
alleged that he was then repeatedly sexually assaulted by the principals of DEN, Marc
Collins-Rector ("Collins-Rector") and Chad Shackley ("Shackley") at their home in

984341

1  Los Angeles.

2      34.    The Hawaii Suit then goes on to allege that Neuman himself – then the

3  president of DEN – also repeatedly sexually assaulted Egan, at the Collins-

4  Rector/Shackley home and in conjunction with Collins-Rector/Shackley's alleged

5  abuse, over a one to two year period.  The Hawaii Suit further alleges that

6  Mr. Neuman was part of a "sordid sex ring" in which Mr. Neuman, along with

7  Collins-Rector, Shackley and other prominent gay men, used their positions within in

8  the entertainment industry to sexually exploit Egan.

9      35.    While the allegations against Mr. Neuman were verifiably false and

10 maliciously false, defendants recognized that they were barred by California's statute

11 of limitations.  Thus, in order to forum shop their claim into the still-open Hawaii

12 statute of limitations, defendants also alleged that Egan went to Hawaii twice in 1999

13 with Collins-Rector and Shackley, that Mr. Neuman went on both trips, and that he

14 also sexually abused Egan during those trips.

15     36.    While the Hawaii Suit was being filed on April 21, 2014, Herman and

16 Egan (along with Egan's mother) conducted the press conference they announced in

17 their press release.  During that conference, Herman summarized the sordid claims

18 that they were asserting against Mr. Neuman (with Egan sitting next to him):

19         "The third name and the third lawsuit I filed today was against

20         David Neuman.  We allege that David Neuman was a

21         participant in the Hollywood sex ring. That he participated in

22         supplying Mike with drugs and alcohol coerced him into having

23         sex at 15 years old on through 17 in Hawaii."

24     37.    Shortly after the press conference concluded, Herman and/or Herman

25 Law modified the press release announcing the filing of these three lawsuits to

26 identify Mr. Neuman as being one of the defendants, and to provide an internet link to

27 the Hawaii Complaint for anybody who wished to have a copy.

28 **III.    Mr. Neuman Retains Counsel And Then Provides Defendants With**

---

9

COMPLAINT

**Objective and Verifiable Proof that the Claims Against Him Are Not True**

38.   Mr. Neuman immediately retained counsel, and counsel sent the Lawyer Defendants a letter on April 24, 2014 which indicated they were representing Mr. Neuman.  This letter further indicated that Mr. Neuman had unequivocal and uncontroverted evidence that proved that the claims against him were unfounded, asserted that the Lawyer Defendants did not conduct the factual investigation required by Rule 11 and demanded that the lawsuit be dismissed.  It ended by advising that counsel would accept service of the Hawaii Suit if Defendants improvidently intended to continue with the litigation.

39.   The very next day, Lee Cohen, an attorney who works for Herman Law, responded with a letter suggesting that the parties "dispense with the usual discovery formalities" and asking for the documents and evidence which Mr. Neuman contended demonstrated that the claims against him were not true.

40.   Gallagher that same day wrote his own letter and asked for this same evidence.

41.   In response, Mr. Neuman's counsel invited the Lawyer Defendants (along with Mr. Cohen) to meet in person so that they could share evidence with each other.

42.   Gallagher responded by saying he was not available and declined to meet.  Herman, through Mr. Cohen, indicated that he too was not available but proposed an alternate day for that meeting.

43.   Meanwhile, Gallagher a few days later (on May 1, 2014) sent a letter requesting that Mr. Neuman waive the requirement of service.  Gallagher's letter attached pre-printed forms to effectuate the waiver of service and provided a postage-paid envelope to return the forms once signed.

44.   Similarly, a week later (on May 7, 2014), Gallagher sent a 7 page letter purporting to advise Mr. Neuman and his counsel of their obligation to preserve evidence.

984341

45. Meanwhile, Herman met in person with Mr. Neuman's counsel on May 6, 2014 to exchange evidence and information about the case. Herman claimed during that meeting that he had conducted an investigation before filing suit, but only identified one person with whom he claimed to have spoken before the Hawaii Suit was filed – Chad Shackley. Herman admitted that Shackley was one of the other individuals whom Egan claimed sexually abused him, but Herman claimed that Shackley confirmed that Neuman had abused Egan as well.

46. Counsel also discussed the evidence demonstrating Mr. Neuman's innocence. They discussed how, back in 2000, Egan filed a suit in the Los Angeles Superior Court (the "2000 Action") that mirrored the claims Egan was now asserting. They discussed how, in the 2000 Action, Egan claimed that while he was a child actor for DEN, he was repeatedly sexually abused and molested at the Collins-Rector/Shackley home by Collins-Rector, Shackley and another DEN

47. founder – Brock Pierce ("Pierce").

48. Counsel also discussed the impact of this lawsuit, which Herman admitted litigated essentially the same underlying claims as alleged in the Hawaii Suit. Counsel also pointed out that while Egan was litigating the issue of his alleged sexual abuse by DEN founders in the 2000 Action, he did not claim that Mr. Neuman (or anyone else) had also engaged in any wrongdoing.

49. Counsel also provided Herman with a two page declaration, signed by Egan himself in 2003, which among other things, stated *under oath* that:

      a. "David Neuman has always acted appropriately towards me";

      b. "I have never had any kind of physical contact with David Neuman other than what is normal and appropriate between non-sexual acquaintances: e.g., handshakes, etc."; and

      c. "David Neuman has never been present when I was involved in

11
COMPLAINT

984341

1    any type of sexual conduct, never harassed me, never made

2    sexually suggestive remarks to me, and never acted improperly

3    around me or toward me, on a personal or professional level."

4    *See* Exhibit B.

5        50.    Herman indicated that he had never seen this declaration before and did

6    not know of its existence.  Through counsel, Mr. Neuman demanded that Herman

7    dismiss the lawsuit with a public apology.  Herman said he would talk to Egan,

8    promised to then contact Mr. Neuman's counsel, and left the meeting.  Herman never

9    made the promised contact.

10   **IV.   Mr. Neuman Discovers that Defendants Filed The Hawaii Suit Even**

11   **Though Their Preliminary Investigation Confirmed That Mr. Neuman**

12   **Was Not in Hawaii with Egan**

13       51.    After meeting with Herman, Mr. Neuman's counsel contacted the only

14   individual that Herman indicated was contacted as part of his investigation and whom

15   supported Egan's claims – Chad Shackley.

16       52.    Shackley confirmed that he and Collins-Rector went on two trips to

17   Hawaii in or around 1999.  He stated that Mr. Neuman was not on the first trip, and

18   he has no recollection of Mr. Neuman being on the second one.  And, perhaps even

19   more astonishing, he stated that he did not recall *Egan* being on either trip either!

20       53.    Shackley also said that he was contacted, and then visited in person, by

21   an investigator who stated that he worked for Herman and the Herman Law Firm.  He

22   said that he told the investigator this same information, *i.e.,* that neither Egan nor

23   Neuman were on the Hawaii trips.

24       54.    In other words, the Lawyer Defendants filed the Hawaii Suit after the

25   sole witness they identify speaking with as part of their pre-litigation "investigation"

26   told them that neither Mr. Neuman nor Egan were in Hawaii during the trips which

27   formed the basis for their suit in Hawaii.

28

984341

V.   **Defendants Do Not Dismiss the Hawaii Suit So Mr. Neuman Moves for**
     **Dismissal and Serves A Rule 11 Sanctions Motion**

55.   Having not heard promptly from Herman after in-person meeting, Mr. Neuman's counsel sent Herman a letter dated May 13, 2014 to follow up on their discussion. The letter discussed the declaration signed by Egan, and provided a copy of the declaration signed by Shackley stating that neither Mr. Neuman nor Egan were on the Hawaii trips.

56.   This letter also provided further information demonstrating why defendants' claims were verifiably false. It quoted certain portions of the deposition testimony that Egan gave in the 2000 Action. Specifically, it quoted Mr. Egan's testimony stating that he had never taken a trip with Collins-Rector and Shackley "outside the continental U.S." (i.e. in Hawaii). The letter also pointed out that when Mr. Egan was asked if anybody else besides Collins-Rector, Shackley and Pierce had sexually assaulted him, he admitted under oath: "There was other people that worked down in the DEN facilities, but partaking in all this stuff, I don't think so, no."

57.   The letter closed by noting that the filing of the Hawaii Suit violated the Lawyer Defendants' Rule 11 obligations and repeated Mr. Neuman's demand that the Hawaii Suit be dismissed with prejudice and with a written apology.

58.   Defendants did not respond to this letter within the timeframe requested. As a result, Mr. Neuman filed a Motion to Dismiss the action for lack of personal jurisdiction, arguing that he was not in Hawaii during the two trips alleged in the Hawaii Suit.

59.   Mr. Neuman's Motion to Dismiss was supported, in part, by the Egan declaration discussed above where he admitted that Mr. Neuman did not engage in any wrongdoing, sexual or otherwise, toward Egan (and thus could not be subject to jurisdiction in Hawaii for Egan's claims). It was also supported by declarations from Shackley and **five other individuals** who confirmed that Mr. Neuman was not present on the Hawaii trips alleged in the Hawaii Suit.

984341

60.    At the same time, Mr. Neuman served a motion for sanctions against the Defendants for filing the Hawaii Suit without any factual support in violation of Rule 11 of the Federal Rules of Civil Procedure.  This Sanctions motion argued that defendants failed to conduct the investigation mandated by Rule 11 before filing the Hawaii Suit, as evidenced by, among other things:

    a.  Shackley's telling Herman's investigator, before the complaint was filed, that neither Mr. Neuman nor Egan were on the Collins-Rector/Shackley trips to Hawaii;

    b.  Egan's under-oath deposition testimony in connection with his prior lawsuit against Collins-Rector, Shackley and Pierce, where testified that he was not sexually assaulted by anyone other than those three defendants; and

    c.  Egan's under-oath declaration stating that Mr. Neuman did not engage in any improper conduct, sexual or otherwise, with Egan.

61.    The Rule 11 motion also argued that Herman's and Egan's press conference, where they announced the claims against Mr. Neuman, was improper and clearly designed to create a media circus to generate the maximum public exposure possible, thereby publicly abusing and smearing Mr. Neuman's family, reputation and career.

62.    Approximately one week after the Motion to Dismiss was filed and the Motion for Sanctions was served, Herman reportedly told the press that Egan had taken and passed a polygraph test "relating to the allegations he had made."  Thus, even when faced with these two motions, Herman was still telling the press that Egan's allegations were well founded.

63.    While Herman (and Egan) showed no hesitation making their allegations against Mr. Neuman to the press, they refused to even attempt to defend them before the Court.  On the day before Mr. Neuman could file his motion for sanctions, Defendants on June 4, 2014 dismissed the Hawaii Suit so as to ensure that they would

984341

1    ***not*** have to justify their actions, support their claims, or explain how they could have

2    filed the Hawaii Suit when it was directly refuted by two separate, under-oath

3    admissions by Egan as well as the under-oath testimony of numerous witnesses,

4    including at least one whom they spoke with, all of whom said that Mr. Neuman was

5    never in Hawaii with Egan.

6        64.    While the dismissal ended the Hawaii Suit, it did not end the terrible

7    damage that Mr. Neuman suffered as a result of the maliciously false allegations

8    against him.  The allegations remain quickly and easily found – a Google search of

9    Mr. Neuman's name as of the date of this complaint reveals that ten of the first twelve

10   websites listed by Google report on Egan's allegations.  Defendants' malicious and

11   false allegations have left a strong, negative mark on Mr. Neuman's reputation which

12   can only be corrected by this legal action.

13   ### FIRST CLAIM FOR RELIEF FOR MALICIOUS PROSECUTION

14   ### (Against All Defendants)

15       65.    Mr. Neuman realleges and incorporates herein by reference all of the

16   preceding and following paragraphs of this Complaint.

17       66.    The Defendants initiated and maintained the Hawaii Suit against

18   Mr. Neuman with knowledge that the Hawaii Suit lacked probable cause to as to any

19   claim alleged therein against Mr. Neuman.

20       67.    On June 4, 2014, Defendants voluntarily dismissed the Hawaii Suit in

21   Mr. Neuman's favor, following Mr. Neuman's filing of a Motion to Dismiss and his

22   service of a Rule 11 Motion, both of which were based, in part, on prior sworn

23   statements of Egan that contradicted the allegations in the Hawaii Suit and which

24   rendered the Hawaii Suit unmeritorious.

25       68.    At all relevant times, Defendants acted maliciously and without probable

26   cause in bringing and perpetuating the Hawaii Suit because they did not honestly and

27   reasonably believe that there were grounds for any of the claims alleged in the Hawaii

28   Suit.

984341

1    69.    In initiating and perpetuating the Hawaii Suit without any probable

2 cause, Defendants acted primarily for a purpose other than attempting to succeed on

3 the merits of the claims stated therein (which they knew they could not do). Instead,

4 Mr. Neuman is informed and believes that defendants brought the Hawaii Suit in an

5 attempt to, among other things:

6        a.    induce Mr. Neuman to pay defendants money to settle their

7            baseless claims against Mr. Neuman;

8        b.    cause other individuals who learned about the Hawaii Suit to

9            contact the Lawyer Defendants and retain them to represent them

10           in other litigation;

11       c.    annoy and harass Mr. Neuman; and

12       d.    damage Mr. Neuman's reputation and prejudice him.

13   70.    As a direct and proximate result of Defendants' conduct, Mr. Neuman

14 was forced to expend a significant amount of time and money in defending against the

15 meritless Hawaii Suit. Further, Mr. Neuman suffered significant harm to his personal

16 reputation and business standing in the community as well as severe mental and

17 emotional distress. These damages have resulted in harm to Mr. Neuman in an

18 amount in excess of the jurisdictional limit of the Court. The conduct of Defendants,

19 individually and collectively, was a substantial factor and proximate cause in bringing

20 about Mr. Neuman's harm.

21   71.    In initiating and continuing the Hawaii Suit, Defendants acted with

22 oppression, fraud, and malice, including, but not limited to, acting with an intent to

23 subject Mr. Neuman to cruel and unjust hardship in conscious disregard to

24 Mr. Neuman's rights. These acts justify the awarding of punitive damages against

25 the defendants, and each of them.

26     **SECOND CLAIM FOR RELIEF FOR ABUSE OF PROCESS**

27             **(Against All Defendants)**

28   72.    Mr. Neuman realleges and incorporates herein by reference all of the

984341

1    preceding and following paragraphs of this Complaint.

2        73.    Mr. Neuman is informed and believes that Defendants' initiation and
3    publication of the Hawaii Suit was done for an ulterior purpose and motive wholly
4    separate from the purported purpose of the litigation (*i.e.*, to prosecute a claim of
5    sexual abuse). To the contrary, Mr. Neuman is informed and believes that the Hawaii
6    Suit was initiated so that it could be publicized and become well known within the
7    entertainment industry so that the Lawyer Defendants could then contact other gay
8    men in the entertainment industry and intimidate and extort fraudulent settlements
9    from those men by threatening them with similar allegations that they sexually abused
10   young boys if they did not agree to pay funds to the Lawyer Defendants.

11       74.    Mr. Neuman is also informed and believes that Defendants also initiated
12   and publicized the Hawaii Suit in an attempt to troll for additional plaintiffs who,
13   having read about the litigation, would then contact the Lawyer Defendants and seek
14   their representation to assert other sexual assault claims.

15       75.    Mr. Neuman is informed and believes that Defendants were successful in
16   their ulterior purpose and motivation, in that after the publication of the Hawaii Suit,
17   the Lawyer Defendants were able to secure additional plaintiffs and then intimidated
18   and threatened litigation similar to the Hawaii Suit to extort "settlement" funds from
19   third parties who chose to pay rather than be subjected to litigation tactics that
20   defendants' levied on Mr. Neuman.

21       76.    As a direct and proximate result of Defendants' conduct, Mr. Neuman
22   was forced to expend a significant amount of time and money in defending against the
23   meritless Hawaii Suit. Further, Mr. Neuman suffered significant harm to his personal
24   reputation and business standing in the community as well as severe mental and
25   emotional distress. These damages have resulted in harm to Mr. Neuman in an
26   amount in excess of the jurisdictional limit of the Court. The conduct of Defendants,
27   individually and collectively, was a substantial factor and proximate cause in bringing
28   about Mr. Neuman's harm.

17
COMPLAINT

77.     In initiating and continuing the Hawaii Suit, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to subject Mr. Neuman to cruel and unjust hardship in conscious disregard to Mr. Neuman's rights.  These acts justify the awarding of punitive damages against the defendants, and each of them.

**THIRD CLAIM FOR RELIEF FOR DEFAMATION**

**(Against Defendants Egan, Herman and Herman Law)**

78.     Mr. Neuman realleges and incorporates herein by reference all of the preceding and following paragraphs of this Complaint.

79.     On April 20, 2014, Herman issued a press release on his website which stated that he was going to announce the filing of three new lawsuits on behalf of Egan and identify three more Hollywood executives who sexually assaulted young boys.

80.     The following day, April 21, 2014, Herman and Egan held a press conference where numerous false and unprivileged statements about Mr. Neuman were made by Herman and Egan, including statements that:

a.     "David Neuman was a participant in the Hollywood sex ring";

b.     Mr. Neuman "participated in supplying Mr. Egan with drugs and alcohol"; and

c.     Mr. Neuman "coerced Mr. Egan into having sex at 15 years old on through 17 years old in Hawaii."

81.     The press conference was well attended by the media.  Video of the conference was streamed live globally and was distributed from numerous sources on the internet, and the press conference received extensive coverage in the electronic and print media as well (all of which remains readily available on the internet today).

82.     That same day, Defendant Herman updated the press release on his firm's website so that it now identified Mr. Neuman as one of the Hollywood executives who defendants accused had sexually assaulted Egan.

984341

83.     The statements made in the press release and during the press conference were false and defamatory statements accusing Mr. Neuman of committing criminal and sexual misconduct when, in fact, Mr. Neuman had never engaged in any such conduct and when defendants knew, or at the very least should have known, that Mr. Neuman had not engaged in such conduct.

84.     The statements above also constitute libel and slander *per se* in that they accuse Mr. Neuman of serious criminal and sexual misconduct.

85.     As a direct and proximate result of Defendants' conduct, Mr. Neuman was forced to expend a significant amount of time and money in defending against the meritless Hawaii Suit.  Further, Mr. Neuman suffered significant harm to his personal reputation and business standing in the community as well as severe mental and emotional distress.  These damages have resulted in harm to Mr. Neuman in an amount in excess of the jurisdictional limit of the Court.  The conduct of Defendants, individually and collectively, was a substantial factor and proximate cause in bringing about Mr. Neuman's harm.

86.     In initiating and continuing the Hawaii Suit, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to subject Mr. Neuman to cruel and unjust hardship in conscious disregard to Mr. Neuman's rights.  These acts justify the awarding of punitive damages against the defendants, and each of them.

## FOURTH CLAIM FOR INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

87.     Mr. Neuman realleges and incorporates herein by reference all of the preceding and following paragraphs of this Complaint.

88.     As set forth above, the defendants initiated and publicized the Hawaii Suit without any cause or justification and then made outrageous statements about Mr. Neuman which alleged that Mr. Neuman sexually abused Egan when he was

984341

1  between the ages of 15 and 17 years old in a press conference before a worldwide

2  audience, all in their intentional and/or reckless attempt to secure a settlement from

3  Mr. Neuman and to serve as a basis to locate additional plaintiffs and to intimidate

4  and extort "settlements" from other gay men in the entertainment industry.

5       89.   Defendants' conduct was outrageous by any objective standard, was

6  without cause or excuse, exceeded all bounds of decency and was intended to cause

7  Mr. Neuman to suffer severe emotional distress and psychological trauma, including,

8  without limitations, humiliation, worry, anxiety, anguish, suffering and grief.

9       90.   This emotional distress and psychological trauma has caused

10  Mr. Neuman damages in an amount in excess of the Court's jurisdictional minimum.

11       91.   In engaging in the conduct set forth above, Defendants acted with

12  oppression, fraud, and malice, including, but not limited to, acting with an intent to

13  subject Mr. Neuman to cruel and unjust hardship in conscious disregard to

14  Mr. Neuman's rights. These acts justify the awarding of punitive damages against the

15  defendants, and each of them.

16          **FIFTH CLAIM FOR NEGLIGENT**

17         **INFLICTION OF EMOTIONAL DISTRESS**

18            **(Against All Defendants)**

19       92.   Mr. Neuman realleges and incorporates herein by reference all of the

20  preceding and following paragraphs of this Complaint.

21       93.   As set forth above, the defendants initiated and publicized the Hawaii

22  Suit without any cause or justification and made outrageous statements about

23  Mr. Neuman which alleged that Mr. Neuman sexually abused Egan when he was

24  between the ages of 15 and 17 years old in a press conference before a worldwide

25  audience, all in an attempt to secure a settlement from Mr. Neuman and to serve as a

26  basis to locate additional plaintiffs and to intimidate and extort "settlements" from

27  other prominent gay men.

28       94.   Defendants' conduct was outrageous by any objective standard, was

COMPLAINT

984341

1  without cause or excuse, exceeded all bounds of decency and caused Mr. Neuman to

2  suffer severe emotional distress and psychological trauma, including, without

3  limitations, humiliation, worry, anxiety, anguish, suffering and grief. Indeed, a

4  reasonable man, normally constituted, would be unable to adequately cope with the

5  mental stress engendered by the Defendants' conduct.

6       95.    This emotional distress and psychological trauma has caused

7  Mr. Neuman damages in an amount in excess of the Court's jurisdictional minimum.

8  ## SIXTH CLAIM FOR FALSE LIGHT INVASION OF PRIVACY

9  ### (Against Egan, Herman and Herman Law)

10       96.    Mr. Neuman realleges and incorporates herein by reference all of the

11  preceding and following paragraphs of this Complaint.

12       97.    As set forth above, Herman and Egan held a press conference where

13  numerous false and unprivileged statements about Mr. Neuman were made by

14  Herman and Egan, including statements that:

15          a.    "David Neuman was a participant in the Hollywood sex ring";

16          b.    Mr. Neuman "participated in supplying Mr. Egan with drugs and

17              alcohol"; and

18          c.    Mr. Neuman "coerced Mr. Egan into having sex at 15 years old on

19              through 17 years old in Hawaii."

20       98.    The press conference was well attended by the media. Video of the

21  conference was streamed live globally and was distributed from numerous sources on

22  the internet, and the press conference received extensive coverage in the electronic

23  and print media as well (all of which remains readily available on the internet today).

24       99.    That same day, Defendant Herman updated the press release on his

25  firm's website so that it now identified Mr. Neuman as one of the Hollywood

26  executives who defendants accused had sexually assaulted Egan.

27       100.    The statements made in the press release and during the press conference

28  were false and defamatory statements accusing Mr. Neuman of committing criminal

984341

1    and sexual misconduct when, in fact, Mr. Neuman had never engaged in any such

2    conduct and when defendants knew, or at the very least should have known, that

3    Mr. Neuman had not engaged in such conduct.

4         101.   Egan, Herman and Herman Law invaded Mr. Neuman's privacy because

5    they placed Mr. Neuman in a false light that would be highly offensive to a

6    reasonable person, and Egan, Herman and Herman Law had knowledge of or acted in

7    reckless disregard as to the falsity of the statements and the false light in which

8    Mr. Neuman was being placed.

9         102.   This invasion of privacy has caused Mr. Neuman damages in an amount

10   in excess of the Court's jurisdictional minimum.

11                          **PRAYER FOR RELIEF**

12        WHEREFORE, Mr. Neuman prays for relief as follows:

13        1.      For special damages including attorneys' fees and other costs in

14   defending the Lawsuit, damage to reputation, psychological trauma, and harm to

15   business interests, in an amount to be proven at trial in excess of $1 million;

16        2.      For general damages according to proof at trial;

17        3.      For attorneys' fees and costs of suit herein;

18        4.      For punitive damages in such an amount as the Court may deem

19   appropriate to penalize Defendants for their intentional and malicious conduct;

20        5.      For prejudgment interest; and

21        6.      For such other relief as the Court may deem Mr. Neuman entitled to

22   receive.

23

24

25

26

27

28

984341

## DEMAND FOR JURY TRIAL

Plaintiff David Alexander Neuman hereby demands a jury trial of all issues in this action triable as of right by a jury.

DATED:  March 3∂, 2015

Respectfully submitted,

CASE LOMBARDI & PETTIT

By: _____

JOHN R. DWYER, JR.

Attorneys for Plaintiff
DAVID ALEXANDER NEUMAN

984341